IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

NOV 1 7 2009

Clerk of Court

| | | |
|---|---|---|
| FRONT CARRIERS LTD., | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. _____ |
| | § | |
| -against- | § | IN ADMIRALTY, Rule 9(h) |
| | § | |
| TRANSFIELD ER CAPE LTD., | § | |
| | § | |
| Defendant. | § | |

# H-09-3719

## VERIFIED COMPLAINT

Plaintiff, Front Carriers Ltd. ("Front Carriers" or "Plaintiff"), by and through its attorneys, Gardere Wynne Sewell LLP, for its Verified Complaint against Transfield ER Cape Ltd., alleges, upon information and belief, as follows:

### JURISDICTION

1.     This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

### PARTIES

2.     At all times material herein, plaintiff Front Carriers was and is a business entity organized and existing under the laws of Liberia and maintains a place of business at c/o Golden Ocean Management AS, Bryggegata 3, P.O. Box 2005-Vika, 0125 Oslo, Norway.

3.      Upon information and belief, at all times material herein, Defendant Transfield ER Cape Ltd. is a business entity organized and existing under the laws of the British Virgin Islands.

## THE RELEVANT AGREEMENT

4.      On or about August 9, 2005, Transfield ER Cape Ltd., as owner, and Front Carriers, as charterer, entered into a Contract of Affreightment on the AMWELSH Coal Charter Form 1979, as amended by the parties, for the carriage of multiple cargoes of coal from various optional ports in Australia to various optional ports in Western Europe (the "COA").  A true copy of the COA is annexed as Exhibit 1.

5.      Front Carriers entered into the COA for the purpose of fulfilling its own lifting requirements under a separate contract of affreightment with a third-party charterer ("Atic"). Stated another way, Front Carriers was contractually bound to provide vessels to Atic on identical terms as the COA, and Front Carriers entered into the COA with Transfield ER Cape Ltd. to fulfill its obligations to Atic under that separate contract of affreightment.

6.      Transfield ER Cape Ltd. failed to perform its final two liftings under the COA, causing Front Carriers to sustain damages in two fashions related to the first missed lifting and in one fashion related to the second missed lifting.

### The COA's Nomination Clause

7.      The COA's rider has a "Nomination Clause" (Section 10) that sets forth how Front Carriers was to give notice of its intended liftings under the COA.  The initial notice to be given by Front Carriers was approximately 30 days before the beginning of each quarter:  "Around 30 (thirty) days prior the beginning of each quarter of first shipment for one year, [Front Carriers] will do their utmost to give [Transfield ER Cape Ltd.] a tentative schedule program."

8.     After this tentative schedule, Front Carriers was to give Transfield ER Cape Ltd. not less than 45 days notice of actual intended laydays/cancelling days (a time window during which Front Carriers desired a Transfield ER Cape Ltd. vessel to arrive at the port designated by Front Carriers):   "Not less than 45 (firty-five) days prior beginning of the desired laydays/cancelling dates with 15 days spread, [Front Carriers] will notify [Transfield ER Cape Ltd.] of the program i.e. intended loading port and discharging port with combination of loading/discharging ports if any."

9.     Upon receiving this 45 day notice, Transfield ER Cape Ltd. had the obligation to respond within ten days with a nominated vessel or a substitute vessel that Transfield ER Cape Ltd. would charter in to fulfill its obligations under the COA:   "[Transfield ER Cape Ltd.] to nominate within 10 (ten) days a vessel or substitute."

10.     The following section in the COA's rider (Section 11, subsection (a)), specifically details the consequences if Transfield ER Cape Ltd. failed to perform as required under the COA:

> Transfield [ER Cape Ltd.] shall during the terms of this agreement provide sufficient tonnage to perform all the voyages under this agreement.  With respect to this obligation, [Transfield ER Cape Ltd.] shall not be able to claim force majuere if and as far as the prevention of the performance of this obligation is – wholly or partially – due to risks resulting from [Transfield ER Cape Ltd.'s] other fleet commitments.  [Transfield ER Cape Ltd.] shall therefore, if such prevention occurs, be held fully responsible for the performance of this obligation.

## THE DISPUTE: BREACH OF CONTRACT

### The First Missed Lifting (Lifting Number Four) and Attempted Mitigation

11.     The first three liftings of the five to be completed under the COA were carried out without incident.

12.     During the time period from December 2005 to May 2007, however, the daily hire rates for bulk cargo vessels (such as the type to be employed by Front Carriers under the COA) increased drastically.   Average rates for a bulker similar to the types of vessels to be nominated under the COA more than tripled during this period.  Annexed as Exhibit 2 is a true copy of an index prepared by Simpson, Spence and Young (a charter broker in the industry), which shows the calculated index for the type of vessel covered by the COA rising from approximately 6,300 to 20,300 during the recited time period.

13.     On or about November 22, 2006, Front Carriers advised Transfield ER Cape Ltd. by e-mail that it anticipated its fourth lifting to occur in the window between March 10, 2007 and March 25, 2007 and that lifting would involve a voyage from Dalrymple Bay, Australia to Rotterdam and Antwerp.   This notice was the initial "tentative schedule" required of Front Carriers under the COA's rider Section 10.

14.     Transfield ER Cape Ltd. did not respond to Front Carriers' November 22, 2006 notice.

15.     On or about  January 4, 2007, Front Carriers advised Transfield ER Cape Ltd. by e-mail that its original tentative scheduled loading date in March 2007 was to be postponed until a window of May 10-25, 2007.  A true copy of this e-mail message given by Front Carriers to Transfield ER Cape Ltd. on January 4, 2007 for the fourth lifting is annexed as Exhibit 3.

16.     Later that same day, Transfield ER Cape Ltd. responded to Front Carriers' revised tentative notice by stating "*REGRET OWNERS CANNOT ACCOMODATE [sic] [Front Carriers'] REQUEST TO POSTPONE SHIPMENT TO MAY.*"  A true copy of Transfield ER Cape Ltd.'s response through broker's e-mail is annexed as Exhibit 4.

4

17.    The next day, Front Carriers responded to Transfield ER Cape Ltd.'s message as follows:

> *Please note that there has never been a firm nomination of voyage no:4 under the [COA], only an advice of next lifting. We fully trust that you will honour your obligations once a firm nomination has been given.*

A true copy of Front Carriers' January 5, 2007 e-mail is annexed as Exhibit 5.

18.    Transfield ER Cape Ltd. rejected Front Carriers' position and advised Front Carriers that it was nominating a vessel to perform for Front Carriers in March 2007 (as per the initial tentative schedule).   Transfield ER Cape Ltd.'s refusal to provide a vessel for Front Carriers' fourth lifting request for May 2007 in accordance with Front Carriers' request was a breach of, *inter alia*, Sections 10 and 11(a) of the COA's rider.

19.    Transfield ER Cape Ltd. has taken the position with Front Carriers that Front Carriers' November 2006 tentative schedule was the 45-day notice required under Section 10 of the COA's rider, and that Transfield ER Cape Ltd. only was obliged to provide a vessel in accordance with that notice. If that were truly the case, however, Transfield ER Cape Ltd. would have had to provide the name of a nominated vessel within 10 days of the date of Front Carriers' November 22, 2006 e-mail which gave the initial tentative notice.   Transfield ER Cape Ltd. never nominated a vessel in response to the November 22, 2006 notice, belying its stated position to the contrary.

20.    When Transfield ER Cape Ltd. insisted on presenting its vessel in March 2007, Front Carriers accepted the vessel (while reserving its rights to claim for damages resulting from the wrongful nomination) in an effort to mitigate its damages by making a profit on a voyage

using that vessel. The name of the vessel presented by Transfield ER Cape Ltd. for March 2007 was the "C MARCH."

21.     Front Carriers (through its managers Golden Ocean Group Limited) went into the market to obtain a cargo for the C MARCH. On or about January 17, 2007, Front Carriers reached a fixture with charterer Rio Tinto for the voyage charter of the C MARCH. A true copy of that voyage charter is annexed as Exhibit 6. After obtaining a cargo for the C MARCH, Front Carriers advised Transfield ER Cape Ltd. of the designated ports for the Rio Tinto cargo to be carried on the C MARCH.

22.     Transfield ER Cape Ltd., however, refused to accept Front Carriers' port designations for the Rio Tinto cargo. Thus, Front Carriers now had committed to carry cargo for Rio Tinto in order to fill the wrongfully nominated C MARCH. After having done so, Transfield ER Cape Ltd. then refused to provide its vessel to carry the cargo that Front Carriers had committed to carry aboard the C MARCH.

23.     Because of Transfield ER Cape Ltd.'s refusal to present the C MARCH for the Rio Tinto cargo, Front Carriers was obliged to charter in replacement tonnage to carry the cargo procured to mitigate damages for Transfield ER Cape Ltd.'s wrongful nomination. Front Carriers (through Golden Ocean) time chartered the vessel ANANGEL SAILOR to perform the carriage of the Rio Tinto cargo, which charter was performed in May 2007 rather than March 2007 by agreement between Front Carriers and Rio Tinto. A true copy of the ANANGEL SAILOR voyage charter dated April 19, 2007 is annexed as Exhibit 7.

24.     Front Carriers was damaged in an amount presently estimated as $1,938,937 as a result of having to cover for the transportation of the substitute cargo intended as mitigation for Transfield ER Cape Ltd.'s wrongful nomination. A true copy of Front Carriers' calculation of its

estimated damages relating to this claim is annexed as Exhibit 8.  Front Carriers will explain the damages calculations in the section below entitled "Damages Calculations".

25.     Upon information and belief, Transfield ER Cape Ltd. intentionally sabotaged Front Carriers' efforts to use a Transfield ER Cape Ltd. vessel for the fourth lifting of the COA (as well as the fifth lifting and the mitigation voyage) because daily hire rates had increased so dramatically that Transfield ER Cape Ltd. manufactured an excuse to avoid its remaining contractual commitments.  In fact, based on Transfield ER Cape Ltd.'s submissions in another Rule B proceeding in New York (discussed further below), Transfield ER Cape Ltd. chartered the C MARCH to a third party for a daily hire rate of $55,000, in comparison to the admitted $8,000 per day it was slated to receive under the COA's rates.  In other words, Transfield ER Cape Ltd. chartered the C MARCH to a third party for a nearly 700% increase in hire rate to the detriment of Front Carriers.

26.     In addition to the damages sustained by Transfield ER Cape Ltd.'s refusal to present the C MARCH in March 2007, Front Carriers was obligated to perform the lifting of Atic's cargo in May 2007 (which lifting Transfield ER Cape Ltd. refused to perform).  Front Carriers therefore was required to procure substitute tonnage at a much higher rate than that contained in the COA (because of the aforementioned rise in the market) to perform under its contract of affreightment with Atic.  Front Carriers chartered the vessel CHINA STEEL GROWTH to lift the cargo that initially was supposed to be carried by Transfield ER Cape Ltd. A true copy of the CHINA STEEL GROWTH time charter is annexed as Exhibit 9.

27.     Front Carriers therefore was damaged in the total amount of $7,104,189 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic.  That total amount combines the lost profit that Front Carriers would

7

have made had Transfield ER Cape Ltd. performed the fourth lifting ($356,900) with the losses that Front Carriers sustained from having to charter in replacement tonnage ($6,747,289). True copies of Front Carriers' claimed damages relating to these claims are annexed as Exhibits 10 and 11, respectively. These damages figures likewise will be discussed below in the "Damages Calculations" section below.

**The Second Missed Lifting (Lifting Number Five)**

28.     The second missed lifting developed in a similar factual progression. Front Carriers gave Transfield ER Cape Ltd. notice on June 4, 2007 by e-mail of its tentative schedule to request a Transfield ER Cape Ltd. vessel to present for loading in the first half of August 2007 for a voyage from Dalrymple Bay, Australia to Rotterdam and Antwerp.

29.     Transfield ER Cape Ltd. did not reply to that notice.

30.     On June 14, 2007, Front Carriers advised Transfield ER Cape Ltd. that it had revised its tentative schedule and shifted the presentation window from the first half of August to the first half of September 2007.

31.     In response to Front Carriers' revised tentative schedule, Transfield ER Cape Ltd. once again took the position that Front Carriers' initial tentative schedule was Front Carriers' firm notice and that Transfield ER Cape Ltd. only would present a vessel during the August 1-15 window. If that were truly the case, however, Transfield ER Cape Ltd. would have had to provide the name of a nominated vessel within 10 days of the date of Front Carriers' June 4, 2007 e-mail, in which Front Carriers provided its tentative schedule. Transfield ER Cape Ltd. never gave such a notice.

32.     Because of the additional losses subsequently caused by Front Carriers' attempts to mitigate Transfield ER Cape Ltd.'s failed fourth lifting, and because of Transfield ER Cape

Ltd.'s clear intention to refuse to provide tonnage for Front Carriers regardless of the voyage proposed by Front Carriers, Front Carriers accepted Transfield ER Cape Ltd.'s repudiation of the fifth lifting.

33.     Front Carriers therefore was required to procure substitute tonnage at a much higher rate than that contained in the COA to perform under its contract of affreightment with Atic. Front Carriers chartered the vessel ROYAL CHORALE to lift the cargo that initially was supposed to be carried by Transfield ER Cape Ltd. True copies of the ROYAL CHORALE fixture message for the ROYAL CHORALE time charter, as well as a true copy of the prior time charter on which that fixture was based, are annexed as Exhibit 12.

34.     Front Carriers therefore was damaged in the estimated total amount of $5,216,872 as a result of having to charter in substitute tonnage to meet its obligations under its contract of affreightment with Atic. That total amount combines the lost profit that Front Carriers would have made had Transfield ER Cape Ltd. performed the fifth lifting ($206,533) with the losses that Front Carriers sustained from having to charter in replacement tonnage ($5,010,339). True copies of Front Carriers' claimed damages relating to these claims are annexed as Exhibits 13 and 14, respectively. These damages figures likewise will be discussed below in the "Damages Calculations" section below.

**Damages Calculations**

35.     The COA provided a schedule of freight rates (per metric ton, FIOST terms) for carriage of cargoes from the various load ports to the various delivery ports named in the COA. This schedule can be found at Section 5 of the COA's rider.

36.     At the time that Front Carriers sought Transfield ER Cape Ltd. to perform the fourth and fifth liftings under the COA, the COA's freight rates were much less than the

prevailing market rates for bulk cargo vessels. This caused Front Carriers to sustain losses each time it had to procure substitute tonnage for a Transfield ER Cape Ltd. vessel which should have, but did not, carry the cargoes at issue. Front Carriers will address the fourth and fifth liftings damages claims before addressing the losses sustained in the attempted mitigation effort.

**The Fourth Lifting/CHINA STEEL GROWTH**

37.     When Transfield ER Cape Ltd. refused to carry the fourth lifting requested by Front Carriers, Front Carriers chartered the vessel CHINA STEEL GROWTH as substitute tonnage. Exhibits 10 and 11 are Front Carriers' worksheets which sets forth its calculations for its claim of $7,104,189 that will be addressed in this subsection. Each will be addressed in turn:

Exhibit 10

38.     Exhibit 10 is entitled "Transfield4," and represents the expected profit ($356,900) that Front Carriers would have enjoyed had Transfield ER Cape Ltd. presented its vessel for the fourth lifting as requested by Front Carriers. Exhibit 10 lists in the left hand column, second section from the top, the "Port Rotation" of Dalrymple/CL – Rotterdam – Antwerp. That section also includes (a) the freight rate that Front Carriers would earn under the Atic COA, which was $15.45 per metric ton, and (b) the total volume of the intended cargo, which was 164,882 metric tons. Multiplying the freight rate by the cargo volume results in a freight figure for the Atic COA of $2,547,427. This figure can be seen at the top of the right hand column on Exhibit 10. Added to that figure is demurrage of 36.25 days (at $23,000 per day) for a total of $833,750, mostly for waiting to load at Dalrymple Bay. Adding the freight and expected demurrage and subtracting the broker's commission gives an expected net revenue under "Transfield4" of $3,254,383.

39.     Under the COA, the freight rate for this voyage would have been $13.80 per metric ton (see COA Rider, Section 5, Dalrymple Bay loading section).  Multiplying this figure by the cargo volume results in a freight figure for the Transfield COA of $2,190,045 (this figure takes into account a deduction for the charter broker's commission).  Credited to Transfield ER Cape Ltd. also is a demurrage amount of $707,438, employing the same amount of delay and using the Transfield COA demurrage rate.  Subtracting this amount ($2,897,483) from the expected net revenue from the Atic COA under "Transfield4" gives Front Carriers an expected net profit of $356,900 had the "Transfield4" voyage been completed.  Because the "Transfield4" voyage was not performed by a Transfield ER Cape Ltd. vessel, however, Front Carriers was compelled to charter in replacement tonnage at a much higher rate, as set forth in Exhibit 11.

Exhibit 11

40.     Exhibit 11 is entitled "CHINA STEEL GROWTH," and sets forth the costs of chartering in the substitute tonnage to perform the fourth lifting under the COA.  The figures referring to the Atic COA remain the same, such as freight rate, cargo volume, and net revenue of $3,254,383.  The costs incurred, however, are much more substantial.

41.     Because of the aforementioned surge in the market, the substitute vessel, CHINA STEEL GROWTH, was fixed at the daily hire rate of $84,000 per day (see Exhibit 9, Rider, Section 37).  As shown by section 3 of the left column of Exhibit 11, the CHINA STEEL GROWTH required 101.54 days to complete the voyage, including 9.03 days for ballast passage, 38.79 days for loaded passage, and 1.5 days for canal passage.  It also included 5.81 days for loading, 6.23 days for discharging, and 40.18 extra days waiting in port.  These numbers are reflected in Exhibit 11 in the section second from the bottom. Multiplying 101.54 days times $84,000/day results in $8,209,868 in time charter hire (after deducting the charter broker's

commission) incurred for Front Carriers' use of the CHINA STEEL GROWTH as a substitute vessel.

42.     Not only did the time charter of the CHINA STEEL GROWTH cost in terms of hire payments, it also cost Front Carriers for the variety of port charges, canal costs and fuel costs that it would not have incurred under the COA with Transfield ER Cape Ltd.   These additional costs amounted to $1,787,669 (these charges are listed in the right column of Exhibit 11 below the New Revenue amount).

43.     Therefore, for the actual voyage that took place, Front Carriers earned $3,254,383.   That figure was reduced, however, by the extra charges resulting from the time charter mentioned in paragraph 42, which brought Front Carriers' revenue down to $1,466,714. This left Front Carriers with still having to pay the owners of the CHINA STEEL GROWTH the hire payment of $8,209,868 (plus meals and cables in the amount of $4,135), which resulted in Front Carriers sustaining a loss of $6,747,289 for the actual performance of the fourth lifting.

44.     Finally, comparing Front Carriers' losses for the fourth lifting (-$6,747,289) with the profits that it should have earned ($356,900) results in Front Carriers' damage figure for the fourth lifting of $7,104,189.

**The Fifth Lifting/ROYAL CHORALE**

45.     When Transfield ER Cape Ltd. refused to carry the fifth lifting requested by Front Carriers, Front Carriers chartered the vessel ROYAL CHORALE as substitute tonnage.   Exhibits 13 and 14 are Front Carriers' worksheets which sets forth its calculations for its estimated claim of $5,216,872 that will be addressed in this subsection.   Each will be addressed in turn:

Exhibit 13

46.     Exhibit 13 is entitled "Transfield5," and represents the expected profit ($206,533)
that Front Carriers would have enjoyed had Transfield ER Cape Ltd. presented its vessel for the
fifth lifting as requested by Front Carriers.  Exhibit 13 lists in the left hand column, second
section from the top, the "Port Rotation" of Dalrymple/CL – Suez – Rotterdam – Antwerp.  That
section also includes (a) the freight rate that Front Carriers would earn under the Atic COA,
which was $14.70 per metric ton, and (b) the total volume of the intended cargo, which was
166,200 metric tons.  Multiplying the freight rate by the cargo volume results in a freight figure
for the Atic COA of $2,443,140.  This figure can be seen at the top of the right hand column on
Exhibit 13.  Added to that figure is expected demurrage of 25 days (at $23,000 per day) for a
total of $575,000, mostly for waiting to load at Dalrymple Bay.  Annexed as Exhibit 15 is a Port
Congestion Report from Front Carriers' Australian agents which shows the coal loading delay at
Dalrymple Bay as of August 31, 2007 as 30 days.  Adding the freight and expected demurrage
and subtracting the broker's commission gives an expected net revenue under "Transfield5" of
$2,904,960.

47.     Under the COA, the freight rate for this voyage would have been $13.80 per
metric ton (see COA Rider, Section 5, Dalrymple Bay loading section).  Multiplying this figure
by the cargo volume results in a freight figure for the Transfield COA of $2,207,552 (after
deducting the charter broker's commission).  Credited to Transfield ER Cape Ltd. also is a
demurrage amount of $490,875, giving Transfield ER Cape Ltd. an extra half day of demurrage
(because of the disparity in the COAs on this point) and using the Transfield COA demurrage
rate.  Subtracting this amount ($2,698,427) from the expected net revenue from the Atic COA
under "Transfield5" gives Front Carriers an expected net profit of $206,533 had the

"Transfield5" voyage been completed.  Because that voyage was not completed, however, Front Carriers was compelled to charter in replacement tonnage at a much higher rate, as set forth in Exhibit 14.

Exhibit 14

48.  Exhibit 14 is entitled "ROYAL CHORALE," and sets forth the costs of chartering in the substitute tonnage to perform the fifth lifting under the COA.  The figures referring to the Atic COA remain the same, such as freight rate, cargo volume, and net revenue of $2,904,960. The costs incurred, again, are much more substantial.

49.  Because of the aforementioned surge in the market, the substitute vessel, ROYAL CHORALE, was fixed at the daily hire rate of $77,500 per day (see Exhibit 12, fixture message). As shown by section 3 of the left column of Exhibit 14, the ROYAL CHORALE was anticipated to require 80.53 days to complete the voyage, including 9.64 days for ballast passage, 36.89 days for loaded passage, and 1.0 day for canal passage.  It also included 28.25 days in load port, 3.25 days for discharging, and 1.5 extra days waiting in port anticipated.  These numbers are reflected in Exhibit 14 in the section second from the bottom.  Multiplying 80.53 days times $77,500/day results in $6,241,338 in time charter hire (after deducting the charter broker's commission) incurred for Front Carriers' use of the ROYAL CHORALE as a substitute vessel.

50.  Not only were the foregoing estimated expenses incurred for the time charter of the ROYAL CHORALE in terms of hire payments, Front Carriers also incurred estimated costs for a variety of port charges, canal costs and fuel costs that it would not have incurred under the COA with Transfield ER Cape Ltd.  These additional costs are estimated as $1,904,790 (these charges are listed in the right column of Exhibit 14 below the New Revenue amount).

51.     Therefore, for the ROYAL CHORALE charter, Front Carriers was expected to earn $2,904,960.  That figure was reduced, however, by estimated extra charges resulting from the time charter mentioned in paragraph 50, which will brought Front Carriers' revenue down to an estimated $1,000,170.  This left Front Carriers with still having to pay the owners of the ROYAL CHORALE the hire payment of $6,007,288 (plus meals and cables in the anticipated amount of $3,221), which resulted in Front Carriers sustaining an estimated loss of $5,010,339 for the actual fifth lifting.

52.     Finally, comparing Front Carriers' losses for the fourth lifting (-$5,010,339) with the profits that it should have earned ($206,533) results in Front Carriers' estimated damage figure for the fifth lifting of $5,216,872.[1]

**The Attempted Mitigation/ANANGEL SAILOR**

53.     As stated above in paragraphs 20-24, Front Carriers attempted to mitigate its expected losses from Transfield ER Cape Ltd.'s refusal to perform the fourth lifting by accepting Transfield ER Cape Ltd.'s wrongful nomination of the C MARCH and employing that vessel to carry cargo for Rio Tinto.  When Transfield ER Cape Ltd. subsequently refused to provide the offered C MARCH, Front Carriers was compelled to charter in the ANANGEL SAILOR to carry the Rio Tinto cargo.  Exhibit 8 is Front Carriers' worksheet which sets forth its damage calculation figures which will be addressed in this subsection.

54.     Exhibit 8 is entitled "ANANGEL SAILOR," and sets forth the revenue earned and costs of chartering in the substitute tonnage to perform the Rio Tinto charter.  The freight rate for that charter was $22.50 per metric ton and the cargo volume was 168,574 metric tons,

---

[1] This estimate has now been calculated at $5,802,872.00 as submitted to the Paris arbitration panel considering the dispute between the parties, as noted in paragraph 61, *infra*.  However, Front Carriers will not claim the additional losses for the purposes of obtaining additional Rule B security at this time for purposes of maintaining continuity with the New York proceeding.

amounting to a total of $3,792,915 in freight earned.   Adding demurrage in the amount of $546,276 and subtracting the broker's commission of $108,480 resulted in a net revenue of $4,230,711.

55.     From the net revenue of $4,230,711, various port costs, canal costs, fuel charges and other miscellaneous charges of $1,675,689 were incurred to reduce the earnings on the ANANGEL SAILOR charter to Rio Tinto $2,555,021.

56.     The cost of chartering in the ANANGEL SAILOR, however, far exceeded the earnings made from Rio Tinto.  Front Carriers fixed the ANANGEL SAILOR at the daily hire rate of $66,000 per day (see Exhibit 7, clause 4).  As shown by section 3 of the left column of Exhibit 8, the ANANGEL SAILOR took 70.69 days to complete the voyage, including 8.81 days for ballast passage, 30.67 days for loaded passage, and 0.75 days for canal passage.  It also included 22.48 days in load port, 6.98 days for discharging, and 1.0 extra day waiting in port. These numbers are reflected in Exhibit 8 in the section second from the bottom.  Multiplying 70.69 days times $66,000/day results in $4,490,423 in time charter hire (after deducting the charter broker's commission) incurred for Front Carriers' use of the ANANGEL SAILOR as a substitute vessel.

57.     Therefore, Front Carriers' earnings after expenses on the ANANGEL SAILOR charter was $2,555,021, but its costs were $4,493,957 (charter hire plus $3,534 in meals and cables), resulting in Front Carriers sustaining a loss of $1,938,937 for the ANANGEL SAILOR mitigation voyage.

**The New York Rule B Proceedings**

58.     On July 11, 2007, Front Carriers filed a lawsuit in the United States District Court for the Southern District of New York (the "New York court") seeking the Rule B attachment of

16

Transfield ER Cape Ltd.'s property in an identical amount as set forth in this complaint (the "New York Proceeding").  Transfield ER Cape Ltd. moved to vacate the attachment order in the New York Proceeding, which motion was denied and following which Front Carriers amended its complaint.

59.     Several weeks later, Front Carriers' New York counsel determined that Transfield ER Cape Ltd was requesting its customers to send Transfield ER Cape Ltd. wire transfer payments by U.S. Dollars payable to another Transfield entity (Transfield ER Ltd.).  Front Carriers then filed an *ex parte* application to amend the complaint once again to add Transfield ER Ltd. as a defendant in order to catch these transfers.  A few weeks later, Front Carriers attached approximately $8.2 million in one day of Transfield ER Ltd. funds and became fully secured in the New York Proceeding.  The entire amount of $15,101,338 was attached through interception of electronic funds transfers at New York banks.

60.     In the course of Front Carriers' becoming fully secured, Transfield applied to the court for an order directing Front Carriers to post $5,210,280 in counter-security pursuant to Supplemental Rule E(7).  The New York court granted this application and Front Carriers posted this counter-security.

61.     After the reciprocal security was in place, the parties agreed to escrow the respective security amounts by escrow agreement amongst Front Carriers, Transfield ER Cape Ltd., and JPMorgan Chase Bank, N.A. ("JPMorgan"), by which agreement JPMorgan accepted the escrow funds and agreed to act as escrow agent.  The parties also approached the New York court and obtained a consent order directing the placement of the funds in the JPMorgan escrow account.  The funds remain in escrow today.  Thereafter, the parties commenced arbitration in Paris over their respective claims, which arbitration proceeding remains in progress.

62.     On October 16, 2009, the United States Court of Appeals for the Second Circuit issued its decision in *Shipping Corporation of India Ltd. v. Jaldhi Overseas Pte Ltd.*, No. 08-3477-cv(L), 08-3758-cv(XAP), 2009 WL 3319675, __ F.3d ___ (2d Cir. Oct. 16, 2009) (hereafter referred to as "*Jaldhi*").  This decision overruled the Second Circuit's decision in *Winter Storm Shipping v. TPI*, 310 F.3d 263 (2d Cir. 2002), and its progeny insofar as they held that EFTs passing through New York intermediary banks are attachable property of the defendant under federal maritime law.

63.     On October 20, 2009, citing the *Jaldhi* decision, the New York court issued an Order to Show Cause ordering FCL to "explain[ ] why the ex parte order for Process of Maritime Attachment and Garnishment and any attachments effectuated pursuant to that order should not be vacated, and accordingly, why this case should not be dismissed."  A true copy of the New York court's Order to Show Cause dated October 20, 2009 is annexed as Exhibit 16.

64.     On November 16, 2009, after the New York court granted an extension of time to Front Carriers to file its response to the Order to Show Cause, Front Carriers submitted its response.  A true copy of Front Carriers' response to the New York court's Order to Show Cause is annexed as Exhibit 17.

65.     As explained by the Declaration of Lasse Brautaset, Esq. dated November 16, 2009, submitted in support of Front Carriers' response to the New York court's Order to Show Cause, Front Carriers will be severely prejudiced by its loss of security in the New York Proceeding as an investigation in Transfield ER Cape Ltd.'s business activities showed it has significantly reduced or even ceased its business operations since the financial crisis last fall.  A true and correct copy of the Brautaset Declaration is annexed as Exhibit 1 to the Affidavit of

Christopher R. Nolan dated November 17, 2009 ("Nolan Aff.") and filed herewith this Complaint.

### The *International & Economic Trading Corp. v. Transfield ER Cape Ltd.* Rule B

66.     While preparing its response to the Order to Show Cause, Front Carriers' New York counsel discovered the matter entitled *International & Economic Trading Corp. v. Transfield ER Cape Ltd.*, No. 08 Civ. 8459 (RMB) (hereafter "*International*"), pending in the United States District Court for the Southern District of New York. In that proceeding, plaintiff had attached the amount of $8,648,578.90 and those funds were transferred to the court's registry investment system (or "CRIS"). Upon information and belief, these funds now are on deposit in the CRIS account located at the Federal Reserve Bank of Dallas, Houston branch.

67.     On October 29, 2009, counsel for Transfield ER Cape Ltd. in the *International* case wrote to the assigned judge, the Honorable Richard M. Berman, seeking the release of Transfield monies. In seeking such relief Transfield admitted the monies were its property when stating "[i]n this case, Plaintiff attached various electronic funds transfers in which Transfield was either an originator or beneficiary, in the hands of garnishee intermediary banks within the District in the total sum of $8,648,578.90." Counsel noted the monies had been placed in the registry "between April and May 2009" and sought the immediate release of the attached funds to Transfield. A true and correct copy of Transfield's counsel's letter in the *International* case is annexed as Exhibit 2 to the Nolan Aff.

68.     On November 12, 2009, Judge Berman ordered that the Transfield funds in the CRIS account be released and "returned to Defendant [Transfield]" and that counsel for the parties were to submit a proposed order by November 16. A true and correct copy of Judge

Berman's Order dated November 12, 2009 in the *International* case is annexed as Exhibit 3 to the Nolan Aff.

69.     In reviewing the docket for the *International* case, the last entry is the November 12 Order and thus no subsequent Order has been docketed yet concerning the return of funds in the CRIS account to Defendnat.

### AGGREGATE CLAIMS

70.     The aggregate amount of Front Carriers' claims sustained under both missed liftings, plus the ANANGEL SAILOR mitigation voyage, as best as presently can be estimated, is $14,259,998.

71.     The COA provides that French law will govern resolution of disputes between the parties.  Under French law, Front Carriers also is entitled to recover interest at the "legal interest" rate (currently 2.95%), which amount is estimated to be $841,340, as set forth below:

| | | |
|---|---|---|
| Interest: | $ | 841,340 ($14,259,998 x 0.0295/year x 2 years) |
| Total Principal Claim: | $14,259,998 | |
| Total Sought: | **$15,101,338** | |

72.     Transfield ER Cape Ltd. cannot be found within the Southern District of Texas but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of, or for the benefit of, Transfield ER Cape Ltd. with the Federal Reserve Bank of Dallas, Houston Branch in the CRIS account and/or under the name of *International & Economic Trading Corp. v. Transfield ER Cape Ltd.*, No. 08 Civ. 8459 (RMB).

### REQUEST FOR RELIEF

**WHEREFORE**, Front Carriers Ltd. prays:

1.    That a summons with process of attachment and garnishment may issue against the Defendant Transfield ER Cape Ltd.; and if the Defendant cannot be found, then that its goods, chattels and credits within the district, and particularly all bank accounts and other property of Transfield ER Cape Ltd. with the financial institution noted above in paragraph 70, may be attached in an amount sufficient to answer Plaintiff's claim;

2.    That a judgment may be entered in favor of Front Carriers Ltd. and against Transfield ER Cape Ltd. in the amount of USD $15,101,338 (including estimated interest), and that a decree of condemnation may be issued against the property and credits of the Defendant, Transfield ER Cape Ltd., for the amount of Plaintiff's claim, with interest; and

3.    That this Court grant Front Carriers Ltd. such other and further relief which it may deem just and proper.

Dated:   November 17, 2009

GARDERE WYNNE SEWELL LLP

J. James Cooper
Texas State Bar No. 04780010
James J. Sentner Jr.
Texas Bar No. 18029200
William E. Matthews
Texas Bar No. 1321900
Nikeyla Johnson
Texas State Bar No. 24065505
1000 Louisiana, Suite 3400
Houston, Texas  77002
Telephone:  (713) 276-5500
Facsimile:  (713) 276-5555

ATTORNEYS FOR PLAINTIFF,
FRONT CARRIERS LTD.

## **VERIFICATION**

STATE OF TEXAS )

:ss.:

COUNTY OF HARRIS )

_James J. Jentner, Jr._, being duly sworn, deposes and says:

    I am a member of the firm of Gardere Wynne Sewell LLP, counsel for Front Carriers Ltd. ("Front Carriers"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Front Carriers and corresponded with Front Carriers' representatives regarding this matter. I am authorized by Front Carriers to make this verification, and the reason for my making it as opposed to an officer or director of Front Carriers is that there are none within the jurisdiction of this Honorable Court.



Sworn to before me this
17th day of November, 2009

_Edythe L. Blankenship_
Notary Public

EDYTHE L. BLANKENSHIP
Notary Public, State of Texas
Commission Expires 02-14-2012

22

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **FRONT CARRIERS LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **-against-** | § | **IN ADMIRALTY, Rule 9(h)** |
| | § | |
| **TRANSFIELD ER CAPE LTD.,** | § | |
| | § | |
| **Defendant.** | § | |

### AFFIDAVIT THAT DEFENDANTS
### CANNOT BE FOUND WITHIN THE DISTRICT

Nikeyla Johnson , being first duly sworn, on oath deposes and says:

1.      I am a member of the firm of Gardere Wynne Sewell LLP, attorneys for plaintiff Front Carriers Ltd. ("Plaintiff" or "Front Carriers") and I am duly admitted to practice before the United States District Court for the Southern District of Texas.

2.      I am familiar with the facts and circumstances underlying this dispute and I am submitting this affidavit in support of the Verified Complaint and the Writ of Attachment.

3.      On information and belief, Defendant Transfield ER Cape Ltd. ("Defendant" or "Transfield") cannot be found within this district.  In order to make this affidavit, I reviewed the following:

   a.   Results from a search on an internet-based telephone directory for the State of Texas (the Defendant was not listed).

   b.   Information from the Texas Secretary of State indicating that the Defendant is not listed as a corporation registered to do business in the State of Texas and has not appointed a registered agent to receive process in Texas.

      c.  Results from Hoover Business and Google searches on the Defendant in reference to Texas (which did not yield any relevant results).

    4.      To the best of my knowledge, Defendant cannot be found within this district or within the State of Texas.

DATED this 17th day of November, 2009

_____
SIGNATURE

SUBSCRIBED AND SWORN TO BEFORE ME on this /7ᵗʰ day of November 2009, to certify which witness my hand and official seal.

*Edythe R. Blankenship*
_____
Notary Public In and For The State of TEXAS

EDYTHE L. BLANKENSHIP
Notary Public, State of Texas
Commission Expires 02-14-2012