# EXHIBIT 6

CODE NAME:  VOY June 2006


STANDARD FORM

VOYAGE CHARTER PARTY


BETWEEN


RIO TINTO SHIPPING PTY LIMITED
A.C.N. 007 261 430


AND


GOLDEN OCEAN GROUP LIMITED


DATED:  17TH JANUARY, 2007

NO:  GOL 1347

# CONTENTS

**CLAUSE**                                                         **PAGE**

CONTENTS ................................................................................................................. 2

1.     DEFINITIONS ......................................................................................... 1

2.     BASIC OBLIGATIONS ........................................................................ 2

3.     CARGO - SHIPMENT, SIZES AND OPTIONS ............................... 2

4.     VESSEL'S DESCRIPTION ................................................................. 2

5.     OWNER'S/MASTER'S OBLIGATIONS .......................................... 4

6.     ISM CLAUSE ....................................................................................... 4

7.     I.T.F. CLAUSE .................................................................................... 5

8.     LOADING PORT ................................................................................. 5

9.     VOYAGES ............................................................................................ 5

10.    DISCHARGING PORT(S) ................................................................ 5

11.    LAYDAY AND CANCELLING DATE ........................................... 6

12.    RELETTING, SUBLETTING, SUBCONTRACTING AND ASSIGNING .......... 6

13.    NOTICES BY MASTER ...................................................................... 6

14.    LOADING AND DISCHARGING RATES ...................................... 7

15.    PRESENTATION OF NOTICE OF READINESS ......................... 8

16.    COUNTING OF LAYTIME ............................................................... 8

17.    FORCE MAJEURE EXCEPTIONS ................................................. 10

18.    DEMURRAGE/DESPATCH ............................................................. 10

19.    COVERING AND UNCOVERING OF HATCHES ....................... 11

20.    OVERTIME ........................................................................................... 11

22.    STEVEDORE DAMAGE .................................................................... 11

22.   LIGHTERAGE AND LIGHTENING ................................................. 11

23.   PORT CHARGES, DUES AND TAXES ........................................ 12

24.   AGENCY AND DISBURSEMENTS .............................................. 12

25.   BILLS OF LADING .................................................................... 12

26.   RATE OF FREIGHT AND DISCHARGE ........................................ 13

27.   PAYMENT OF FREIGHT ............................................................ 13

28.   DEADFREIGHT ....................................................................... 14

29.   ADDRESS COMMISSION .......................................................... 14

30.   WAR RISKS ........................................................................... 14

31.   EXTRA WAR RISK INSURANCE/WAR BONUS ............................. 14

32.   EXTRA INSURANCE ................................................................ 14

33.   SECRECY .............................................................................. 15

34.   UNFORESEEN CIRCUMSTANCES ............................................. 15

35.   ARBITRATION ........................................................................ 15

36.   PROPER LAW ......................................................................... 15

37.   OIL POLLUTION ...................................................................... 16

38.   LIEN ..................................................................................... 16

39.   DRUG AND ALCOHOL CLAUSE ................................................ 16

40.   GENERAL AVERAGE AND THE NEW JASON CLAUSE ................... 16

41.   BOTH TO BLAME COLLISION CLAUSE ...................................... 17

42.   ICE CLAUSE .......................................................................... 17

43.   ISPS CLAUSE ........................................................................ 18

44.   DEVIATION AND LIBERTIES ..................................................... 19

45.   COMMUNICATIONS ................................................................................19

46.   AMENDMENTS ................................................................................20

47.   INCORPORATED DOCUMENTATION ................................................................20

THIS VOYAGE CHARTER PARTY (hereinafter called 'Contract' ) is entered into on the 17th January, 2007

BETWEEN

RIO TINTO SHIPPING PTY LIMITED (A.C.N. 007 261 430) (hereinafter called 'Charterer') of Level 35, 55 Collins Street, Melbourne, Victoria 3000, Australia

AND

GOLDEN OCEAN GROUP LIMITED, Hamilton, Bermuda, as Disponent Owners (hereinafter called 'Owner')

of the "C.MARCH" or similar sub.    hereinafter called the 'vessel'.

WHEREBY IT IS MUTUALLY AGREED AS FOLLOWS:

## 1.   DEFINITIONS

In this Contract, unless a contrary intention appears:

A.   'Bill of Lading' means the Charterer's Standard Form Bill of Lading in Appendix No.1.

B.   'Contract' means this Voyage Charter Party.

C.   'Discharging Port(s)' means any of the ports listed in Clause 10 and includes, unless the context expresses a contrary intention, any berth to which the vessel is ordered at such port.

D.   'Dollars', '$' and 'cents' refer to the lawful currency of the United States of America.

E.   'ETA' means estimated time of arrival.

F.   FIOST means Free In and Out  Spout Trimmed

G.   'ITF' means the organisation presently styled the International Transport Federation or any successor organisation.

H.   'Layby Berth' means the facility adjacent to Charterer's/Shipper's East Intercourse Island berth at Dampier into which, on completion of draft survey, a vessel can be moved always afloat.

I.   'Laydays' and 'Laycan' means the period from the opening loading date to the cancelling or last agreed loading, date.

J.   'MOLOO' means more or less in owner's option.

K.   'NOR' means Notice of Readiness.

L.   'MTDW' means total deadweight metric tons (Summer load line).

M.   'Overtime' means time spent over and above standard and or agreed hours of work.

N.   ' Port(s) of Loading' means any port(s) referred to in Clause 8 at which a vessel loads hereunder.

O.   'RightShip' means RightShip Pty Limited, a company engaged by the Charterer to screen, inspect, survey and/or vet, assess and approve, as a ship acceptable for the carriage on the nominated cargo(s).

P.   'Vessel(s)' means a vessel or vessels nominated by the Owner

Q.  'Voyage(s)' means the carriage of the cargo in the Vessel from the Port(s) of Loading to the Discharging Port(s).

R.  'WMT' means wet metric ton.

S.  'Overage' means a vessel, which by reason of its age and/or class, attracts any additional insurance premiums.

T.  Clause Headings in this Contract are inserted for the parties' convenience only and shall be disregarded for the purposes of interpretation.

## 2.  BASIC OBLIGATIONS

Owner to nominate and provide a vessel, which shall be RightShip approved, loaded with cargo provided by the Charterer under the direction and responsibility of the vessel's Master, and Owner shall carry and deliver the cargo as set out in this Contract.

## 3.  CARGO - SHIPMENT, SIZES AND OPTIONS



A.  The vessel shall load a cargo of coal in bulk, including but not limited to, lump and/or fines iron ore at Charterer's option, but excluding DRI/P, this quantity within the range at Owner's options of minimum      135,000 WMT, maximum 165,000 WMT if loading Dalrymple Bay or minimum 126,000 WMT, maximum 154,000 WMT if loading Newcastle NSW.

Cargo shall be loaded, transported and discharged in accordance with IMO recommendations

B.  The shipment will be deemed to be a full and complete cargo, even if the vessel is not loaded down to her marks by reason of draft restrictions at Loading or Discharging Port(s).

## 4.  VESSEL'S DESCRIPTION

A.  Owner undertakes that the vessel shall at all times be acceptable to Charterer.

The Vessel shall be suitable at all times for the loading, carriage and discharge of the cargoes nominated under this contract.

Charterer and/or Receiver shall have the right at any time on reasonable notice to inspect or survey the vessel or substitute vessel with the Master or his nominee for the purpose of ascertaining whether the vessel meets the requirements set out in Clause 4B and is being maintained and operated in accordance with the terms and conditions of this contract.

B.  Owner shall provide a seaworthy and cargo-worthy vessel for the voyage, which:

(a)  is maximum 15 years of age, non overage, single deck, self trimming, gearless bulk carrier or ore carrier, which has been approved by RightShip, with engine/accommodation aft, each without longitudinal centre line bulkheads; be tight, staunch and strong and in every way fitted for the nominated voyage, and classed 100A1 at Lloyds or equivalent; and

(b)   shall be acceptable to the relevant authorities and conform with all laws, regulations and requirements in force at or applicable to Loading and Discharging Ports, and be maintained to standards of accommodation, equipment, fixtures & fittings acceptable to the Charterer, and

(c)   shall be of such size, draft, airdraft and other dimensions as to permit the vessel to safely enter, berth, lay alongside, load and discharge and depart always safely afloat from Loading and Discharging Port(s); and

(d)   shall have holds strengthened and classed for carriage of coal in bulk; and

(e)   shall be capable of loading cargo in all holds as required by Charterer and be cargo-worthy in every respect ; and

(f)   shall be suitable for grab discharge with no fittings protruding from internal hold surfaces; and

(g)   shall have all cargo holds, compartments, open and closed trunk-ways, where applicable, free of flammable and toxic gasses on presentation of the vessel at the Loading Port and Discharge Port(s); and

(h)   subject to paragraph 4B(g), if the vessel's slop tanks contain any slops, shall be warranted by the Owner at its expense, to have been made safe with inert gas before commencing operations to load and discharge the vessel.

C.   Owner warrants that:

   (a)   if by reason of vessel's construction cost of discharge exceeds the customary normal cost, the extra costs are to be for Owner's account and any additional time used in discharging shall be added to laytime; and

   (b)   Owners' warrant that the vessel is entered with a Protection & Indemnity Club for full P&I coverage and that vessel's hull and machinery is fully insured and shall remain so for the duration of this Contract.

D.   Should the vessel after arrival at a Loading Port or Discharging Port(s) be found to be in breach of sub-clause 4B, then notwithstanding any right(s) of the Charterer elsewhere contained in this Contract, the Charterer may at its option and without prejudice to Owners obligations under this Contract:

   (a)   at the Loading Port, treat the vessel's nomination as cancelled and the voyage unperformed, or;

   (b)   treat the voyage as suspended until Owner rectifies the vessel's default of sub-clause 4B .

Any NOR previously accepted shall be deemed to be invalid and all time counting to be for Owner's account. Owner shall keep Charterer fully indemnified against any consequences of the vessel's failure to comply with the warranties of Clause 4, including any delays, and, where applicable, Charterer's costs to provide a suitable replacement vessel to meet its shipping requirements.

E.   In the event of the Owner providing an overage and/or a vessel not classed as required in subclause 4B(a) the Charterer may at its sole discretion accept in writing such nomination, which acceptance shall in no way relieve the Owner of all its other obligations under this Contract, particularly subclauses 4A, 4B and Clause 32 with which the Owner shall comply.

F.    Following is a description of the vessel:

If "C.MARCH" is nominated as the performing vessel, her description is as follows:
Korea flag/built 1995
151,053 mt dwt on 17,419 m ssw
167, 883 grain cubic
9 holds/9 hatches
LOA/Beam: 273m/43 m
All details "about"

Cargo intake basis DBCT about 140,000 mt

## 5.   OWNER'S/MASTER'S OBLIGATIONS

Owner undertakes that Owner and/or Master:

A.    shall at all times be solely responsible to establish the applicable vessel size, draft
      and air-draft requirements for Loading and Discharging Ports and to ensure that the
      vessel is loaded so as to comply at all times with such requirements; and

B.    should Owner or the Master cause or permit the vessel to be loaded with a quantity
      of cargo such that on arrival the vessel has at any Discharging Port, a draft in excess
      of the permissible entry draft at that port, Charterer or consignee(s) or their agent(s)
      shall have the right to require the vessel to proceed to that port, or to any other port
      or place as they may require, for the purpose of lightening and/or complete or partial
      discharge.  The costs of any lightening and any other additional costs incurred and
      time lost by reason of the necessity to lighten and/or divert the vessel as aforesaid as
      a consequence of the above shall be for Owner's account.

C.    further, Owner shall indemnify Charterer and/or consignee(s) against any loss or
      damage resulting from such diversion or delay including but not limited to the costs
      of on-carriage of the cargo to the nominated port, stockpiling charges, deterioration
      to the cargo (including any loss of market).

D.    shall by no later than   fourteen  [14] days before the opening date of the Laycan
      period, nominate a Vessel to perform the Voyage. Failure to do so by the date
      specified in this clause will give the Charterer the right to cancel the Voyage on
      notice to the Owner, fix a vessel against the Owner and to claim as damages from the
      Owner any increased cost differential incurred by the Charterer as a result.

## 6.   ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in
relation to the Vessel and thereafter during the currency of this Contract, the Owners shall
procure that both the Vessel and 'the Company' (as defined by the ISM Code) shall comply
with the requirements of the ISM Code.  Upon request, the Owners shall provide a copy of
the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC)
to the Charterers.

Except as otherwise provided in this Contract, loss, damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owner's account.

## 7. I.T.F. CLAUSE

Owner shall provide evidence to Charterer that vessels, excluding those manned by Master and crew of the same nationality as the flag state of the vessel's registration, shall comply with all the requirements of the International Transport Federation ('I.T.F.') or any successor organisation at the Loading and Discharging Port(s) from time to time applicable.

If the vessel does not possess a current I.T.F. certificate or equivalent acceptable to the I.T.F. or if the vessel certificate lapses at any time during the currency of a voyage under this Contract, Charterer may terminate the voyage.

Further, Owner shall keep Charterer fully indemnified against any consequences (including any delay as well as Charterer's costs to provide a suitable replacement vessel to meet its scheduling requirements) occasioned by such lapse of the vessel's I.T.F certification and/or failure to comply with any rules, by-laws or regulations as aforesaid.

## 8. PORT OF LOADING

The vessel shall proceed with all reasonable despatch to Newcastle, NSW, or Dalrymple Bay, as ordered by Charterer, and there load a full and complete cargo pursuant to the provisions of sub-clause 5A.

All costs of shifting directly between berths, if ordered by Charterer, shall be for Charterer's account and shifting time shall count as laytime.

## 9. VOYAGES

Upon completion of loading and final draft survey and if tide and weather permit the vessel shall proceed at the nominated speed, via the direct and/or customary route to the nominated Discharging Port(s).

Routing via Suez or CGH in Charterers' option (Charterers to pay any rate differential), but subject to head Owners' approval.

## 10. DISCHARGING PORT (S)

A.  The vessel shall discharge always afloat at Rotterdam.
B.  Charterers shall have the option to change the Discharging Port against paying freight which gives the Owner an equivalent time charter return to the base freight rate originally agreed.

## 11.  LAYDAY AND CANCELLING DATE

Charterer is not bound to commence loading the vessel and, unless otherwise agreed, laytime at the Port of Loading shall not count before 10th March, 2007.    Should the vessel not be presented ready to load on or before 25th March, 2007    Charterer has the right, without any penalty attaching, to cancel the voyage.

## 12.  RELETTING, SUBLETTING, SUBCONTRACTING AND ASSIGNING

Charterer may relet or, sublet the vessel and/or assign or subcontract any of its rights, duties or obligations but shall remain at all times fully responsible for all or any part thereof.

## 13.  NOTICES BY MASTER

A.  Port of Loading

The Master of a vessel proceeding to Port of Loading shall advise Rio Tinto Shipping (e-mail: operations@riotinto.com), the Port Authority and agent, in accordance with the voyage instructions, as follows:

(a)  ten (10) days prior to vessel's arrival:

  (i)  giving ETA;

  (ii)  quantity of cargo to be loaded on deepest departure draft; and

  (iii)  distance between keel and hatch coaming;

(b)  seven (7) days prior to vessel's ETA:

  (i)  revised ETA;

  (ii)  advise hatch loading order and quantities of cargo by holds; and

  (iii)  advise expected fore and aft drafts on arrival.

(c)  seventy two (72) hours prior to vessel's ETA confirming or revise information in (b) above.

(d)  forty eight (48) hours; revised ETA

(e)  twenty four (24) hours; revised ETA.

B.  Discharging Port(s)

The Master of each vessel to advise Rio Tinto Shipping (e-mail: operations@riotinto.com Port Authority, consignee and agent (as advised by Charterer in voyage instructions) as follows:

(a)  on departure Port of Loading: ETA Discharging Port and estimated arrival draft;

    (b)    ten (10) days prior arrival: ETA and expected arrival drafts;

    (c)    seventy two (72), forty eight (48) and twenty four (24) hours prior arrival: ETA.

C.    In addition to the foregoing advice 'only' to RIO TINTO SHIPPING, each day noon position report giving the following information:

-    position

-    general average speed

-    ETA at discharge port

-    distance to discharge port.

D.    Charterer may by radioed notice to Master, which notice is deemed to be notice to the Owner for the purposes of this Clause, advise of any change in the order of the Discharging Port(s) provided that such notice is given:

    (a)    at least five (5) days prior to vessel's ETA at first Discharging Port; or

    (b)    within twenty four (24) hours of receipt of Master's advice pursuant to paragraph 11C and that either

    (c)    the vessel as loaded will be able to enter such port; or

    (d)    if such alteration necessitates lightening and/or the use of lighterage at Discharging Port, the provisions of Clause 21 shall apply.

## 14. LOADING AND DISCHARGING RATES

A.    The cargo shall be loaded, spout trimmed and discharged free of expense to Owner, while under Owner's/Master's direction and supervision which includes, but is not limited to loading and discharging speeds, which at all times remain the sole responsibility of the Owner and Master.

B.    Subject to the provision of this Contract the Owner and Master shall be responsible for:-

    (a)    the declaration of cargo quantity to be loaded within the range specified

    (b)    nominating the hatch loading sequence with quantities in each hold; and

    (c)    the calculation and determination of each vessel's drafts at Port of Loading and Discharging Port(s) but always subject to any limitations and restrictions at those ports; and

    (d)    maintaining a seaworthy trim and condition of each vessel at all times.

C.    (a)    Cargo shall be loaded at an average rate of 50,000 WMT at Dalrymple Bay or 40,000 WMT at Newcastle NSW per weather working day of twenty four [24] consecutive hours or pro rata for part thereof, Saturdays, Sundays and Holidays included, irrespective of size of cargo.

    (b)    Cargo shall be discharged at an average rate of 25,000 WMT per weather working day of twenty four [24] consecutive hours or pro rata for part thereof,

Saturdays, Sundays and Holidays included, irrespective of size of cargo, for Rotterdam discharge.

(c) The above loading and discharging terms have been calculated on the basis of all the vessel's hatches being available for loading and discharging when and as required by Charterer.

D. Owner shall provide and maintain in good working order vessel's lights for loading and discharging.

## 15. PRESENTATION OF NOTICE OF READINESS

At Port of Loading or Discharging Port(s)

NOR for loading and discharging is to be tendered any time day or night Saturdays, Sundays or holidays included, by the Master or the vessel's agent, to be accepted, by the shipper or consignee or their nominated agent after the vessel is anchored as directed by port authorities and provided the vessel is in all respects ready to load or discharge, as the case may be.

NOR may be tendered whether the vessel is in berth or not, whether in free pratique or not, whether in customs clearance or not, but in case the vessel is  an ore/oil or ore/bulk/oil carrier the Master must possess a valid gas free certificate (as Owner provides for in paragraph 4B(g)) and present same as required by the Port/Harbour Authority or berth operator.

In the event that free pratique and /or customs clearance is not granted, or the vessel is not ready in all respects to load or discharge the previously tendered NOR shall be deemed null and void and a new NOR shall be tendered when the vessel has complied with the aforementioned conditions.

If Master or vessel's agent fails to tender NOR by the cancelling date pursuant to Clause 11, Charterer may at its option and without prejudice to Owner's obligations under this Contract, treat the vessel's nomination as cancelled and the voyage unperformed.

## 16. COUNTING OF LAYTIME



The measure of Laytime shall be a weather working day of twenty four [24] consecutive hours or pro rata for part thereof, Saturdays, Sundays and Holidays included/excluded as the case may be.

A. At Loading Port

(a) Laytime shall commence running twelve (12) hours after a valid NOR has been accepted in accordance with Clause 15, or when loading commences whichever occurs first.

(b) Time used for draft checks during the course of loading shall not count as laytime whether the vessel is already on demurrage or not.

(c) Laytime shall cease on completion of loading.

**B.**   At Discharging Ports

    (a)   Laytime shall commence running twelve (12) hours after valid NOR has been accepted in accordance with Clause 15, or when discharging commences whichever occurs first.

    (b)   Time used for draft checks during the course of discharge shall not count as laytime whether the vessel is already on demurrage or not.

    (c)   Laytime shall cease on completion of discharge, but any extra time used solely for Charterer's draft survey shall count as laytime.

**C.**   At Port of Loading and Discharging Port(s)

    (a)   Time used in the first shift of the vessel from any waiting place to the berth shall not count as laytime whether the vessel is already on demurrage or not. Cost of the first shift shall be for Owner's account.

    (b)   Time used in shifting directly between berths at Charterer's request shall count as laytime and all costs thereof shall be for Charterer's account.

    (c)   If the Charterer orders the vessel to discharge at two ports, time shall not count from the time of completion of discharge at the first port until arrival of the vessel at the second port, whether in berth or not, or when discharge resumes, whichever occurs first. Shifting time from waiting place to berth in the second port is not to count at as laytime.

    (d)   If either the Master or the Port Authority shall for any reason whatsoever order the vessel out of a berth, time shall not count from the cessation of loading or discharging, whichever is applicable, until the vessel is again in the berth ready to resume loading or discharging, whether the vessel is on demurrage or not.

**D.**   Any time lost during loading or discharging due to the vessel's inability to load or discharge at the rates set out in sub-clause 14C or due to any other defect and/or default in the vessel, deficiency and/or default of vessel's personnel, including inability of the vessel to ballast or deballast at a rate commensurate with the respective loading or discharging rate, then such time lost shall not count as laytime. Any time lost by the vessel in obtaining gas free clearance, either directly or consequentially, shall be for Owner's account, whether the vessel is already on demurrage or not.

**E.**   Laytime shall not be reversible.

**F.**   Laytime permitted at Port of Loading and Discharging Port(s), shall be calculated on the Bill of Lading quantity.

## 17. FORCE MAJEURE EXCEPTIONS

A.   Charterer shall be under no liability to Owner for any delay or failure in the performance of any of its obligations under this Contract nor shall laytime count, nor shall any other time thereby lost count against Charterer whether the vessel is already on demurrage or otherwise, if such delay or failure is due to or results directly or indirectly from war, or the anticipated imminence thereof, between any nations; restraint of rulers, governments or peoples; legislation, decrees, orders, regulations or the like by government of the country of shipment or discharge or any port or waterway where the vessel may from time to time be, or of the vessel's flag; inability to obtain export or import licenses; blockade, sanctions, civil commotion, political disturbances, revolution, revolt or riot, strikes, boycott, lock-outs, industrial disturbances or any effects whatsoever thereof; combinations of seamen or workmen; blockages or obstructions in the loading or discharging port(s), the navigation channels or approaches; accidents or stoppages, mechanical or electrical breakdowns, whether total or partial, at mines, ports, railways, roadways, waterways, ropeways or other means of transport; epidemics, quarantine, acts of God, inclement weather (including but not limited to drought, frosts, tropical revolving storms, high winds, floods, snow, storms, heavy rain, tempests or washaways); congestion at the Port of Loading or Discharging Port(s) resulting from any of the above causes; or any other event or occurrence of any nature or of any kind whatsoever beyond the reasonable control of Charterer, including any delay or failure resulting directly or indirectly from the consequences of such event or events after they have ceased to operate.

B.   In the event of an occurrence of Force Majeure under sub-clause 15A, affecting or likely to affect the performance of any of Charterer's obligations herein, Charterer shall give prompt notice thereof to Owner and shall, if required, and upon reasonable notice, give to Owner in writing particulars of the relevant event, together with such supporting evidence as is reasonably available.

C.   In the event of an occurrence of Force Majeure as aforesaid affecting the performance of any of Charterer's obligations herein, Charterer shall take reasonable steps to minimise any delay or effect of Force Majeure and make good and resume with the least possible delay compliance with any obligation affected. Charterer, whilst having contractual commitments to other owners and operators of other vessels in the Loading Port may be directed by the Port Authority to allocate berths and cargo at that port, and accordingly, Charterer shall not be bound to give to Owner any precedence over any other vessel.

## 18. DEMURRAGE/DESPATCH

At Loading and Discharging Port(s)

A.   Charterer shall pay to Owner demurrage at the rate of $ 25,000 per day of twenty four [24] consecutive hours and pro rata for part thereof for all time used in excess of laytime allowed.

B.   Owner shall pay to Charterer despatch money at the rate of $ 12,500 per day of twenty four [24] consecutive hours and pro rata for part thereof for all laytime saved.

C.   Demurrage and/or Despatch, if any, shall be settled within 14 days of completion of discharge.

## 19.   COVERING AND UNCOVERING OF HATCHES

A.   All time and expenditure relating to the covering and uncovering of hatches shall be for Owner's account.

B.   The Master shall cover the hatch(es) of each hold as soon as loading into that hold has finished.

C.   If weather is inclement or wet the Master shall have all hatches closed when loading or discharging has finished for the day.

D.   During rain and/or snow and/or high wind the Master shall cover up all hatches into or from which loading or discharging is not in progress.

## 20.   OVERTIME

Overtime expenses are to be paid by the party ordering same, except for overtime expenses for the vessel's officers and crew, which shall be borne by Owner. Should overtime work be ordered by Port Authorities or outside bodies, extra expenses shall be shared equally between Charterer and Owner.

## 22.   STEVEDORE DAMAGE

Stevedores, although appointed by Charterer, shipper or receiver(s) or their agents, shall be under the direction and control of the Master. Charterer, shipper or receiver(s) shall not be responsible for the act and default of the stevedores at Loading and Discharging Ports.

All claims for damage allegedly caused by stevedores shall be settled directly between Owner and stevedores at the Loading and/or Discharging Port.

Neither the Charterer nor stevedores shall be responsible for fair wear and tear commensurate with the nature of the trade.

Owner or Master shall give written notice to stevedores of damage claimed not later than twentyfour [24] hours after occurrence.

## 22.   LIGHTERAGE AND LIGHTENING

Charterer has the option of discharging into lighters and/or otherwise lightening the vessel if it so requires; the time and expenses thereof shall subject to Clause 5, be for Charterer's account and time so used to count as laytime.

Otherwise all other terms, conditions and exceptions of this Contract shall apply to lighterage and lightening.

## 23. PORT CHARGES, DUES AND TAXES

Any taxes (including any goods and services taxes, or freight tax), dues, port charges or other charges levied against the vessel and/or freight payments or added to any fees, levies or charges levied against the vessel shall be for Owner's account.

Any taxes, dues or other charges levied against the cargo shall be for the Charterer's account.

## 24. AGENCY AND DISBURSEMENTS

At load/discharge ports, the vessel(s) shall be consigned to agents nominated by the Charterer.

Agency fees as customary shall be for Owners' account. Owners undertake to provide the nominated agents with funds sufficient to cover vessel(s) disbursements prior to arrival at the respective ports and acknowledge that pursuant to Charterers' worldwide agency arrangements, Charterers' may receive appointment fees from the nominated agents, which shall be for Charterers' benefit.

## 25. BILLS OF LADING

All Bills of Lading issued in respect of the shipment of cargo under this Contract shall be in the Standard "CONGENBILL" bill of lading form, Edition 1994 and any subsequent modification thereof. On completion of loading:

A. the Master or Owner's agent shall sign and issue on demand Bill(s) of Lading as presented, in strict conformity with Mate's Receipts by Charterer or Shipper without prejudice to this Contract;

B. the Master shall ensure that (i) Mate's Receipts and ii) Bill(s) of Lading signed and issued by the Master or Owner's agent accurately describe the cargo's apparent order and condition. The Owner shall indemnify the Charterer against all consequences or liabilities which may arise as a result of the Mate's Receipts or Bill(s) of Lading inaccurately describing the cargo' apparent order and condition;

C. except where the Charterer is the Shipper of the cargo shipped under this Contract, the Shipper will not be regarded as the Charterer's agent in presenting the Mate's receipt and or Bill(s) of Lading for signature by the Master or Owner's agents;

D. all Bills of Lading issued under this Charter Party are to incorporate the Australian Carriage of Goods by Sea Act 1991 incorporating the Hague-Visby Rules as amended.

## 26. RATE OF FREIGHT AND DISCHARGE

A.   The rate of freight shall be paid as follows:

(a)   US$ 27.50   per WMT FIOST basis  loading at Dalrymple Bay.

(b)   US$ 30.50   per WMT FIOST basis loading at Newcastle, NSW.

B: Full freight to be deemed earned on completion of loading whether or not the vessel and/or cargo is subsequently lost, and shall be paid on the loaded weight as determined by a joint draft survey made by the Master of the vessel and Charterer's nominated surveyor, which quantity will be incorporated in the Bill(s) of Lading. The cost of Charterer's nominated surveyor is to be for Charterer's account.

## 27. PAYMENT OF FREIGHT

A.   Freight shall be remitted telegraphically by Charterer through its bank to Owner's nominated bank account, ninety percent [90%] for value within five [5] banking days after signing Bill(s) of Lading, but in any case before breaking bulk, on Bill(s) of Lading quantity, non-returnable, ship and/or cargo lost or not lost. Freight shall be deemed paid when Charterer gives to its bank written instructions to make the appropriate remittance and Owner acknowledges any delay in transfer of freight that may thereafter occur, to be outside Charterer's control. The balance of freight together with settlement of despatch and/or demurrage if applicable shall be paid within 30 days of completion of discharge.

B.   Owner's nominated bank account is as follows:

Bank: Skandinaviska Enskilda Banken AB (publ), Oslo Branch
Address: Filipstad Brygge 1,Oslo  Telephone: +47 22 82 70 00
US Dollar acct: 97500442321
IBAN: NO1297500442321
SWIFT : ESSENOKX

in  favour of: Golden Ocean Group Limited

C.   Charterer's nominated bank account is as follows:

Bank of America NT and SA
1850 Gateway Boulevard
Concord
San Francisco CA 94520
USA

Swift ID  BOFAUS6S
ABA No. 121000358
Account Name:    Rio Tinto Shipping Pty Limited
A/C No.  62906-28313

## 28. DEADFREIGHT

Under no circumstances shall deadfreight be payable in respect of any voyage performed under this Contract provided Charterer makes available cargo as confirmed under Clause 3.

## 29. ADDRESS COMMISSION

An address commission of one and one quarter per cent (1.25%) shall be payable to Charterers and a brokerage of one and one quarter (1.25%) shall be payable to FEARNLEYS A/S, Oslo on all freight, deadfreight and demurrage.

## 30. WAR RISKS

A.   No Bill(s) of Lading to be signed for any blockaded port and if the Discharging Port(s) be declared blockaded after Bill(s) of Lading have been signed, or if the port(s) to which the ship has been ordered to discharge either on signing Bill(s) of Lading or thereafter be one to which the ship is or shall be prohibited from going by the government of the nation under whose flag the ship sails or by any other Government.  Owner shall discharge the cargo at any other port covered by this Contract as ordered by Charterer (provided that such other port is not blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the Discharging Port(s) to which she was originally ordered.

B.   The vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the government of the nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such government or any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

## 31. EXTRA WAR RISK INSURANCE/WAR BONUS

Charterer shall pay for the additional cost, if any, of any War Risks Insurance premiums on the vessel and for her crew over the rates in effect on the date of this Contract which are necessitated by the trade in which the vessel is employed under this Contract.  All War Risk Bonuses paid by Owner to members of the crew, in accordance with the provisions of Owner's Maritime Board agreements, and/or similar agreements in excess of those in effect on the date of this Contract as to the trade in which the vessel is employed under this Contract shall to the extent of the excess (if any) of the rates from time to time prevailing in such trade over those in effect on the date of the commencement of the voyage, be for Charterer's account.

## 32. EXTRA INSURANCE

Subject to Clause 4E any extra cost of insurance payable on cargo due to vessel's age and/or class not being one of the ages or classes included in the Classification Clause

which at the particular time is adopted by the Cargo Underwriters and/or route and/or flag and/or ownership, shall be for Owner's account.

## 33. SECRECY

It is hereby agreed that the terms of this Contract are confidential and that neither party shall disclose any of the terms to any third party unless such disclosure shall be required by law or to give commercial effect to this Contract.

## 34. UNFORESEEN CIRCUMSTANCES

Both Owner and Charterer realise that circumstances may arise which could not have been foreseen at the time this Contract was executed and each agree to use their best efforts to solve any such problems in a spirit of mutual understanding and cooperation.

## 35. ARBITRATION

A.  Any dispute arising out of or in relation to this Contract shall be referred to arbitration in London. A single arbitrator to be appointed by agreement between the parties shall settle the dispute; or, in the event one party fails, in response to the other's notice of appointment, to appoint an arbitrator of its choice; the arbitrator so appointed shall be the sole arbiter of the dispute. If the parties cannot agree upon the appointment of the single arbitrator within fourteen [14] days after service by either of a notice to arbitrate, the dispute shall be settled by two arbitrators, each party appointing one arbitrator and in the event of the arbitrators disagreeing on any matter they shall appoint a third arbitrator.

The arbitrators appointed shall be senior commercial or legal men engaged in the shipping industry. The President for the time being of the London Maritime Arbitrators Association shall upon request of either party appoint an umpire.

B.  The arbitrator(s) shall have an absolute discretion in relation to the apportionment of the costs and expenses of the arbitration between the parties.

C.  The award of the arbitrator, arbitrators shall be a condition precedent to the reference of any dispute to a Court.

D.  The arbitration shall be conducted in London in accordance with the provisions of the LMAA's Rules and shall be commenced within 1 year of the dispute arising or lapse.

## 36. PROPER LAW

This Contract shall in all respects be governed by and construed in accordance with Australian law/ English law and each party expressly submits to the jurisdiction of the Australian Courts / English Courts.

## 37. OIL POLLUTION

Owner agrees to indemnify Charterer, its servants, its agent or any other party against any liability which may be imposed upon them or which they may incur under any statute regulation (or requirement or directive made thereunder) of any nation, state or international organisation regarding liability for pollution of navigable waters by oil by reason of any contravention of such statute, regulation (requirement or directive made thereunder) as aforesaid by the vessel, the Master or by any servant or agent of Owner, provided that such contravention shall not have been caused by the party seeking to be indemnified under this Contact and provided further that the facts and matters giving rise to the contravention do not constitute a defence under Article 3 Section 2 of the International Convention on Civil Liability for Oil Pollution Damage 1969. Owner warrants that the ship is adequately insured at all times for any liabilities arising out of any contravention as aforesaid.

## 38. LIEN

If the vessel is under charter to the Owner then the Owner shall defend, indemnify and hold the Charterer herein harmless from any lien on cargo exercised by the actual/head Owner of the vessel arising from the failure of Owner to discharge its obligations to the vessel's actual Owner under charter. All liability of Charterer shall cease upon completion of loading.

## 39. DRUG AND ALCOHOL CLAUSE

Owner/Disponent Owner undertakes to Charterer that it has guidelines on drug and alcohol abuse applicable to each vessel with the objective that no seafarer will navigate a ship or operate its on-board equipment while impaired by drugs or alcohol and that no seafarer will have the use or possession of or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the vessel. Further, the Charterer expects that the Owner/Disponent Owner exercise due diligence throughout the period of the charterparty to ensure that such guidelines are complied with.

## 40. GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1994, as amended, but where the adjustment is made in accordance with the law and practice of the United States of America, the following Clause shall apply:

### NEW JASON CLAUSE

'In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agent(s) may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.'

Charterer shall ensure that the Bills of Lading issued under this Contract shall contain or by general reference be deemed to incorporate the abovementioned 'General Average and New Jason Clause'.

## 41. BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Contract falls to be determined in accordance with the laws of the United States of America, the following Clause shall apply:-

### BOTH TO BLAME COLLISION CLAUSE

'If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the vessel, the owner(s) of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owner(s) in so far as such loss or liability represents loss of, or damage to, any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owner(s) to the owner(s) of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owner(s) as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owner(s), operator(s) or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.'

Charterer shall ensure that the Bill(s) of Lading issued under this Contract shall contain or by general reference be deemed to incorporate the abovementioned 'Both to Blame Collision Clause'.

## 42. ICE CLAUSE

A. Should ice prevent the vessel(s) from reaching Discharging Port(s), Charterer shall have the option of keeping the vessel waiting until the re-opening of navigation on paying demurrage for time thereby lost, or of ordering the vessel to a safe and immediately accessible port (within the range as stated in Clause 24) where it can safely discharge without risk of detention by ice. Such orders are to be given within forty eight (48) hours after Master or Owner has given notice to Charterer and consignee(s) of the impossibility of reaching the Discharging Port.

B. If, during discharging the Master, for fear of the vessel being frozen in, deems it advisable to leave, he has the liberty to do so with whatever quantity of cargo he has on board. Owner shall forthwith give notice to Charterer of the situation. Within forty eight (48) hours after receipt of such notice Charterer shall give notice to Owner in reply nominating an alternate discharge port conforming to the same conditions in sub-clause 40A.

C. On delivery of the cargo at the alternative discharge port, all conditions of the Contract shall apply and Owner shall receive the same freight as if the vessel had discharged at the original Discharging Port, except that if the distance of the alternative discharge port from the Discharging Port exceeds one hundred (100) nautical miles, Charterer shall pay Owner any extra expenses incurred by Owner due to such alteration of destination.

**43.   ISPS CLAUSE**

    a) In this clause:

        (i)   'CSO' means Company Security Officer;

        (ii)   'ISPS Code' means the International Ship and Port Facility Security
              (ISPS) Code (as amended from time to time) and the relevant
              amendments to Chapter XI of the International Convention for the
              Safety of Life at Sea 1974;

        (iii)  'SSO' means Ship Security Officer;

        (iv)  all words and expressions that are defined in the ISPS Code have the
              same meanings in this clause, in particular 'the Company', 'Company
              Security Officer', 'Interim International Ship Security Certificate',
              'International Ship Security Certificate', 'Ship Security Officer' and
              'Ship Security Plan'.

   b) From the date of coming into force of the ISPS Code in relation to the Vessel and
      thereafter during the currency of this Contract, Owner shall ensure that both the
      Vessel and the Company comply at all times with the requirements in the ISPS
      Code relating to the Vessel and the Company.  Owner shall provide to Charterer:

        (i)     a copy of the relevant International Ship Security Certificate (or the
              Interim International Ship Security Certificate) for the Vessel; and
        (ii)    the full style contact details of the CSO.

   c) Except as otherwise provided in this Contract, Owner shall be liable for any
      loss, damage, expense or delay, which arises from any failure at any time of
      the Company or the Vessel to comply with the requirements in the ISPS Code
      (or the taking of any action to meet such requirements) or breach by Owner of
      any of its obligations in this clause.

   d) Charterer shall provide the CSO and either the SSO or the Master with
      Charterer's full style contact details and any other information Owner requires
      to comply with the ISPS Code.  Any delay caused by Charterer's failure to
      provide information required under this paragraph (d) shall count as Laytime
      and Charterer must reimburse Owner for any additional costs incurred by
      Owner, which result directly from Charterer's failure to provide such
      information.

   e) The Master shall be entitled to tender NOR even if the Vessel is not cleared
      due to applicable security regulations or measures imposed by a port facility
      or any relevant authority under the ISPS Code provided that the SSO and the
      Master believe (having made all reasonable enquiries) that clearance will be
      granted swiftly in accordance with normal practice and procedure at the port.
      However, the NOR shall be invalidated if any delay in clearance of the Vessel

arises from any failure at any time of the Company or the Vessel to comply with the requirements in the ISPS Code (or the taking of any action to meet such requirements) or breach by Owner of any of its obligations in this clause.

f) Notwithstanding sub-clause (e), any time lost as a result of security measures imposed by a port facility or relevant authority under the ISPS Code shall not count as Laytime or time on demurrage (unless such lost time was directly caused by Charterer's failure to comply with its obligations in the ISPS Code or this clause), whether the Vessel is on demurrage or not.

g) Notwithstanding anything else contained in this Contract:

Owner and Charterer shall share in equal proportions any additional costs or expenses arising out of, or related to, security regulations or measures required by the port facility or relevant authority under the ISPS Code including security guards, launch services, tug escorts, port security fees or taxes and inspections (provided that if any such additional costs arise solely from either party's failure to comply with the requirements of the ISPS Code or this clause, then that party will be solely responsible for such costs);

Owner shall be responsible for the cost and expense of all measures required by Owner or the Company to comply with the Ship Security Plan.

h) If either party makes any payment, which is for the other party's account according to this clause, the other party shall indemnify the paying party.

## 44. DEVIATION AND LIBERTIES

The vessel shall have liberty to sail with or without pilots, except where compulsory pilotage is required, to tow or to be towed to deviate from the voyage for the purpose of saving human life, to communicate with a vessel in distress in case lives may be in danger or to avoid danger to the ship or cargo, but for no other purpose whatsoever.

## 45. COMMUNICATIONS

It is mutually agreed that the English language will be used in notices, letters, telexes and all other means of communication between parties. In this Contract:

A.   Charterer's address for purpose of service is:
     Rio Tinto Shipping Pty Limited
     Level 35
     55 Collins Street
     Melbourne   Victoria 3000
     Australia
     Facsimile:   +61 3 9283-3316
     Telephone: +61 3 9283-3311
     operations@riotinto.com

B.   Owner's address for purpose of service is:

    Golden Ocean Management AS
    P.O.Box 2005 Vika
    NO-0125 Oslo, Norway
    ( visiting address : Bryggegata 3 )

    Phone : +47 2201 7340 +47 2201 7349
    (direct to Operation Manager Tord Brath)
    Mobile: +47 9758 4001 ( Tord Brath )
    Fax   : +47 2201 7359

    Email : operation@goldenocean.no

Unless otherwise provided, notices hereunder may be given by either party by facsimile, telex, cable or airmail and shall be deemed to have been given at the time they would in normal circumstances be received by the other party.

## 46. AMENDMENTS

Amendments, if any, to the Contract shall be in the form of a properly numbered and executed addendum to the Contract, unless otherwise agreed in writing, telex or facsimile by Charterer.

## 47. INCORPORATED DOCUMENTATION

Any document, letter, fax and/or e-mail created under and with reference to this Contract, is incorporated into and forms part of this Contract, including but not limited to the following:-

    a)   Standard Form (Congen) Bill of Lading.
    b)   Fixture Note(s)

In case of any conflict between the provisions of any of these documents, letters, faxes and or e-mails and the provisions of this Contract, the provision of this Contract will prevail.

**IN WITNESS WHEREOF** the parties hereto have signed this Contract as at the date hereinabove mentioned by their respective duly authorised officers or representatives.

**CHARTERER:**                    **OWNER:**
RIO TINTO SHIPPING PTY LIMITED     GOLDEN OCEAN GROUP LIMITED

....................................................      ....................................................

**X Fearnleys A/S**

### ADDENDUM NO 1.

### TO

### M/V "CMARCH"

### CHARTER PARTY DATED 17TH JANUARY, 2007

It is this day mutually agreed between:

RIO TINTO SHIPPING PTY LIMITED, as Charterer, and GOLDEN OCEAN GROUP LIMITED, as Owner,

That:

The voyage to be performed under this Charter Party shall be converted from a coal cargo, and consist of:

- Minimum 144,000 WMT, maximum 176,000 WMT, exact quantity in Owner's option, of lump and/or fines iron ore in bulk, excluding DRI/P
- Loading port: Dampier
- Discharging port: Rotterdam
- Laydays/cancelling: 15/25th April, 2007
- Loading/discharging terms: 7 total days Shinc
  12 hours turntime at loading
  4 hours turntime at discharging

- Freight rate: USD 21.50 per WMT FIOST

- Routing of laden voyage to be via Suez Canal or Cape of Good Hope, in Owners' option.

All other terms and conditions of the Charter Party dated 17th January, 2007 to remain in force.

Oslo, 8th March, 2007

Owners:                                    Charterers: