# EXHIBIT 16

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/21/09_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRONT CARRIERS LTD.,

                              Plaintiff,

        -v-

TRANSFIELD ER CAPE LTD.,

                              Defendant.

Case No. 07 Civ. 6333 (RJS)

RICHARD J. SULLIVAN, District Judge:

In light of the recent decision by the United States Court of Appeals for the Second

Circuit in *The Shipping Corporation of India Ltd. v. Jaldhi Overseas Pte Ltd.*, ____ F.3d ___,

No. 08 Civ. 3477, 2009 WL 3319675 (2d Cir. Oct. 16, 2009), Plaintiff is HEREBY ORDERED

to provide the Court with a letter, to be *received* no later than Monday, October 26, 2009,

explaining why the *ex parte* order for Process of Maritime Attachment and Garnishment and any

attachments effectuated pursuant to that order should not be vacated, and accordingly, why this

case should not be dismissed. The letter shall be sent to the chambers' email address at

sullivannysdchambers@nysd.uscourts.gov.

SO ORDERED.

Dated:        October 20, 2009
              New York, New York

                                    RICHARD J. SULLIVAN
                                    UNITED STATES DISTRICT JUDGE

# EXHIBIT 17

# Holland & Knight

195 Broadway | New York, NY 10007 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

William J. Honan
212 513 3300
bill.honan@hklaw.com

November 16, 2009

<u>VIA E-MAIL</u>

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 615
New York, New York 10007

> *Front Carriers Ltd. v. Transfield ER Cape Limited*
> *and Transfield ER Limited*
> <u>No. 07 Civ. 6333 (RJS)</u>

Judge Sullivan:

We, on behalf of Front Carriers Ltd. ("FCL"), write in compliance with your Order dated October 20 to explain (i) why the *ex parte* order for Process of Maritime Attachment and Garnishment ("PMAG") should not be vacated; (ii) why the attachments effectuated pursuant to that order should not be vacated and (iii) why this case should not be dismissed.

## 1.   <u>Summary of the Facts</u>

On October 25, 2007, this Court issued an order for PMAG in the amount of $15,101,338 against, *inter alia*, all tangible or intangible property owned by Transfield ER Cape Ltd. or Transfield ER Limited ("Transfield") at garnishee banks in this District.  As set forth in the FCL's complaint, FCL sought the Rule B attachment to secure its breach of contract claim against Transfield in a Paris arbitration.  Declaration of Lasse Brautaset dated November 16, 2009, ¶10.

2 -    The Honorable Richard J. Sullivan

Pursuant to that order, Holland & Knight, on behalf of FCL, began service on the banks on July 11, 2007 and continued through November 8, 2007 and were successful in attaching $15,101,338. Availing itself of Supplemental Rule E(7), Transfield obtained an Order from this Court on November 16, 2007 requiring FCL to post security for Transfield's counterclaim amounting to $5,210,280.

Thereafter, the parties agreed voluntarily to place the funds in a bank escrow. They did so for a number of reasons:

> (i)     to aggregate the funds in a single place,
> (ii)    to provide a contractual framework for the maintenance and disposition of the funds,
> (iii)   to earn interest and
> (iv)    to stop the legal maneuvering.

To accomplish the escrow arrangement, it was necessary to enter into two escrow agreements, each dated December 28, 2007. The first was a trilateral escrow agreement among FCL, Transfield and JP Morgan Chase Bank ("Chase") covering the establishment of the account ("Escrow Account") and the maintenance of the funds ("Bank Escrow Agreement"). The second was a bilateral escrow agreement between Front Carriers and Transfield covering the disposition of the funds based on a settlement if agreed by the parties or on the award when issued in the French arbitration ("Parties Escrow Agreement") (collectively the "Escrow Agreements"). Affidavit of Christopher R. Nolan dated November 16, 2009, Exhs. 11 and 12.

On January 29, 2008, this Court, at the request of the parties, ordered them to transfer the attached funds from the garnishee banks to the Escrow Account and ordered Front Carriers to transfer the counter-security amount to the Escrow Account. As the French arbitration is ongoing, the funds remain in the Escrow Account. The total amount held in the name of Transfield, as of October 31, 2009, was $15,348,585.20; the total amount held in the name of Front Carriers, as of October 31, 2009, was $5,311,915.90. Those amounts are net of Chase's fees and include interest earned.

3 -     The Honorable Richard J. Sullivan

After the issuance of the Second Circuit's decision in *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 2009 WL 3319675 (2d Cir. Oct. 16, 2009 ("Jaldhi"), FCL served the order of attachment on Chase so as to attach Transfield's funds in the Escrow Account. That occurred on November 16, 2009.

### 2.     Summary of FCL's Position

FCL's position is comprised of three parts:

a)     FCL and Transfield have entered into legally valid and binding Escrow Agreements under which they are contractually bound to maintain and dispose of the funds in accordance with the terms of the Escrow Agreements. The Court, on its own, should not disturb those agreements.

b)     If, notwithstanding the existence of the Escrow Agreements, the underlying attachments were to be challenged, the attachments were and continue to be valid. When Transfield's EFTs were attached, the practice among the garnishee banks was to place the funds in a segregated suspense account within each bank. As those funds were then susceptible to creditor attachment, FCL's subsequent attachment of those funds was valid.

c)     In any event, the funds placed in the Escrow Account by Transfield were its property and such property was attached by FCL.

### 3.     Explanation of FCL's Position

In the paragraphs below, we shall explain each part of FCL's position:

(a)     The Funds in the Escrow Are Not Subject to *Jaldhi*

The circumstances of this case have substantially and significantly evolved from the time that the EFTs were attached. After the attachments, the parties decided, for the reasons set forth above, to enter into the Escrow Agreements and to establish the Escrow Account.

4 -    The Honorable Richard J. Sullivan

Those Escrow Agreements are legal, valid and binding on the parties.  *H&H Acquisition corp. v. Financial Intranet Holdings*, 2009 WL 3496826 at *8 (S.D.N.Y. October 29, 2009).

In deciding *Jaldhi*, the Second Circuit applied Article 4A of the UCC ("Funds Transfers") as codified in New York State.  *Jaldhi* 2009 WL 3319675 at *10.  Article 4A was intended to provide a comprehensive body of law defining the rights and obligations that arise from wire transfers (see Prefatory Note, National Conf. of Commissioners on Uniform State Law, UCC [2008] Official Text and Comments, p. 490).  Section 4A-501(a) expressly permits the affected party to enter into an agreement with respect to its in-transit funds:

> Except as otherwise provided in this Article, the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party.

The term "affected party" includes the "Customer" as that term is defined in §4A-105(a)(3).  *Regatos v. North Fork Bank*, 5 N.Y. 3d 395, 402 (2005).  Hence, the Escrow Agreements of which Transfield was a party are binding on both parties.

Section 8 of the Parties Escrow Agreement permits either party "to seek any remedy" under the Supplemental Rules.  Until Transfield makes its challenge, FCL respectfully submits that this Court should not take action which might invalidate the Escrow Agreements. Whether Transfield decides to challenge the Escrow Agreement is an open issue.  In another Rule B attachment case in which Transfield was the plaintiff (*Transfield ER Cape Ltd. v. Crownland Int'l Co. Ltd.*, 08 Civ. 8602 [VM]), Judge Marrero issued a show cause order why the attachment obtained by Transfield should not be vacated.  Transfield notified the Court that the attached funds had been sent to the Court's registry by agreement of the parties and sought an extension of time to prepare its reply.  In light of the funds being in the court registry, Judge Marrero issued an order dated October 28, 2009 stating that a reply was unnecessary.  Nolan Aff. Exhs. 15 and 16.  According to the court docket, no further action was taken.  Transfield, if it does challenge the escrow, would be seeking to have it both ways.

5 -      The Honorable Richard J. Sullivan

     (b)    <u>The Funds in the Banks Were Valid Attachments</u>

     An electronic funds transfer ("EFT") is an instruction from the originator to transfer U.S. dollar denominated funds to the beneficiary. Often, in international transactions, the transfer requires that funds "pass through" an intermediary bank. When the funds are interrupted, e.g., by judicial process, the funds drop out of the transfer process. As a first step, the intermediary bank usually place the funds in a segregated suspense account awaiting instructions from the defendant or the court. In many instances, especially in cases involving large amounts of money, substitute security is posted. In a few cases, a plaintiff posts a bond as expressly permitted under Supp. Rule E(5)(a). As that interim remedy is expensive and unwieldy, the parties often enter into escrow agreements, as the parties have done here, thereby permitting the release of the funds from the segregated suspense account under Supp. Rule E(5)(c).

     While the funds are in the intermediary bank's segregated suspense account, they are the property of the defendant and susceptible to a valid Rule B attachment. As FCL has attached the funds a second time (while in the bank's segregated suspense account), the funds are outside the *Jaldhi* purview and have been validly attached. See *Aurora Maritime Co. v. Abdullah Mohamed Fehem & Co.*, 85 F.3d 44, 46, 48 (2d Cir. 1996) (monies of the defendant in a bank account may be attached pursuant to Rule B under well-settled maritime law).

     In *Jaldhi*, the Second Circuit held that, in the absence of controlling maritime law, the courts should look to state law (New York State law) "to determine property rights" *Jaldhi* at *10. The relevant New York State law was described by the New York Supreme Court, Appellate Division, earlier this year in *Palestine Monetary Authority ("PMA") v. Strachman*, 873 N.Y.S. 2d 281 (1ˢᵗ Dept. Feb. 17, 2009).* In *PMA*, plaintiffs obtained a

---

* PMA was decided after the parties' briefs were filed in *Jaldhi*. There is no indication that PMA was raised during the *Jaldhi* oral argument and it is not cited in the *Jaldhi* decision. When considering New York law as to suspense account attachments, this Court is to follow PMA's analysis as it is the highest court to address the matter. *See Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941) ("the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court.")

6 -   The Honorable Richard J. Sullivan

judgment in the District of Rhode Island against the PLO and the Palestinian Authority (the "PA"), then filed for recognition of that judgment in New York County and served restraining notices on New York banks including the Bank of New York ("BNY").  BNY then restrained $30 million in EFTs where the Palestinian Monetary Authority (the "PMA"), an alleged alter ego, was either the originator or beneficiary.  The EFTs were interrupted and the funds were placed in a suspension account.  The PMA commenced a declaratory judgment proceeding seeking to disassociate itself from the PA and PLO.  The motion court granted the PMA's motion for summary judgment on three grounds including, *inter alia*, that "UCC 4-A prohibits restraint by an intermediary bank, and that, in any event, title to the funds had passed from the PMA" *Id.* at 287.  After reviewing New York law on the topic, including every state court decision considered by the *Jaldhi* court, the Appellate Division unanimously agreed with the plaintiffs and reversed the vacatur pending discovery on the issue of whether defendant had a property interest in the suspense funds.

In the course of its decision, the Appellate Division, in construing UCC Article 4A, held:

(i)      An intermediary bank served with creditor process as to EFTs is not obliged to act with respect to it (UCC 4A 502(4)).

(ii)     If the intermediary bank nonetheless does honor the process and places the funds in a suspense account, the funds become "property" and a court can and should determine the owner of that property.

(iii)    the funds, if the property of the debtor, can validly be enjoined.

See PMA, 873 N.Y.S. 2d at 291-93.

For the following reasons, the funds, while in the segregated suspense accounts, were Transfield's property:

7 -    The Honorable Richard J. Sullivan

- Transfield exercised dominion over those funds by transferring them to the Escrow Account.

- Courts regularly acknowledge that the interrupted funds in the possession of the intermediary bank belong to the defendant. *See e.g., ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 2009 WL 3380611, at \*4 (2d Cir. Oct. 22, 2009), a post-*Jaldhi* opinion regarding EFTs, in which the Second Circuit noted that "[t]he defendant, i.e., the owner of the attached funds . . . can make a motion . . . to contest the validity of the attachment." The defendant is the party at risk as to attachment of EFTs in intermediary banks. If it is originator, the funds would not reached the beneficiary's bank so the debt is still owed to the beneficiary. If the defendant is the beneficiary, the funds have not reached it and it is very difficult to force the originator to pay a second time.

    (c)    FCL's Attachment of Transfield's Funds in the
           Escrow Account is Valid

The parties Escrow Agreement, by its terms, sets forth the property interests of the parties. Each has a current property interest in that the funds are earning interest. Each has a contingent property interest in that, if it succeeds in the French arbitration, it will obtain part or all of the other party's funds. Each has a reversionary property interest in that if it loses the arbitration, it will lose part or all of its own funds. Courts have long held that a party's property interest in an escrow account is subject to a valid attachment. See, e.g., *Gala Enterprise, Inc. v. Hewlett Packard Co.*, 970 F.Supp. 212,217 (S.D.N.Y. 1997), *Astrea United International L.D. v. B.T. Onitri*, 1992 WL 346353 \*3 (S.D.N.Y. 1992), *International Ocean Way Corp. v. Hyde Park Nav. Ltd.*, 555 F.Supp. 1047, 1049 (S.D.N.Y. 1983).

FCL's subsequent attachment of Transfield's property in the Escrow Account, therefore, was valid.

8 -     The Honorable Richard J. Sullivan

    **4.**    **Discovery is Necessary to Ascertain the Role**
                **of Each of the Banks**

    The foregoing analysis assumes that each of the garnishee banks as to which EFTs were attached was acting in an intermediary capacity.  To determine their status, we have served interrogatories on the garnishee banks and are awaiting their replies.  Nolan Aff. ¶16.  In the event that one or more garnishees were not intermediary banks when the funds were attached, there would exist another basis for finding that *Jaldhi* does not apply.

              *             *            *

    For the foregoing reasons, we, on behalf of FCL, respectfully submit that the *ex parte* PMAG order should not be vacated, the attachment orders should not be vacated and the case should not be dismissed.

                    Respectfully submitted,

                    HOLLAND & KNIGHT LLP

                    By

                    William J. Honan

WJH:lb
cc:    **VIA E-MAIL**
        Chalos O'Connor & Duffy LLP
        Eugene J. O'Connor, Esq.
        Timothy Semenoro, Esq.
        Counsel for Defendants

# 8971165_v3